**CITY OF SANTA ROSA et al., Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, \* Respondent.**

**No. 73–3262.**

United States Court of Appeals, Ninth Circuit.

March 29, 1976.

---

\* Consolidated with cases in which the following were Petitioners and the United States Environmental Protection Agency was Respondent: City of San Jose, 73–3263; County of San Mateo, 73–3265; Daly City, 73–3269; City and County of San Francisco, 73–3270; City of Oakland, 73–3282; City of Long Beach, 73–3284; City of Modesto, 73–3297; City of Pasadena, 73–3302; City of Walnut Creek, 73–3309; City of Santa Clara, 73–3315; City of Redwood City, 73–3317; City of Costa Mesa, 73–3342; City of Sunnyvale, 73–3352; City of Palo Alto, 73–3355; City of Stockton, 73–3356; City of Mountain View, 73–3385; City of Lynwood, 73–3400; City of Rialto, 73–3413; City of Redlands, 73–3414; County of Alameda, 73–3425; City of Fairfield, 73–3445; City of Orange, 73–3463; City of Suisun City, 73–3515; City of San Mateo, 73–3517; City of Richmond, 73–3518; Trustees of California State Universities and Colleges, 73–3305; Governor of California, 73–3306; California Air Resources Board, 73–3307; Pacific Legal Foundation, 73–3343; City of Los Angeles, 73–3259; City of Brea, 73–3281; City of Anaheim, 73–3301; City of Burbank, 73–3359; City of Santa Ana, 73–3368; County of Los Angeles, 73–3369; City of Lake, 73–3397; County of Orange, 73–3399; City of Newport Beach, 73–3405; City of Huntington Park, 73–3407; City of Covina, 73–3457; City of San Dimas, 73–3458; City of Cudahy, 73–3459; City of Tustin, 73–3510; City of Fullerton, 73–3512; County of San Bernardino, 73–3412; Southern Baptist General Convention of California, 73–3465.

Barry J. Wolf (argued), San Jose, Cal., David J. Toomey (argued), New York City, Henry C. Thumann (argued), Los Angeles, Cal., Joel S. Moskowitz (argued), San Francisco, Cal., John H. Findley (argued), Sacramento, Cal., for petitioners in Nos. 73–3259 to 73–3607.

Michael D. Graves (argued), Washington, D.C., for respondents.

OPINION

Before: WRIGHT, KILKENNY and SNEED, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This proceeding evolved from numerous petitions for review of regulations promulgated by the Environmental Protection Agency (EPA) under the 1970 amendments to the Clean Air Act (the Act).[1] In due course, petitioners were informed at a prehearing conference that the court contemplated entering a judgment regarding the constitutional issues pursuant to Rule 54(b), Fed.R.Civ.P., prior to disposing of such other issues as the parties presented. Our resolution of those constitutional issues is reported in *Brown v. EPA,* 521 F.2d 827 (9th Cir. 1975).

Subsequently, each petitioner was asked to inform the court what issues, if any, it still desired the court to review. The State of California, the cities of Burbank, Los Angeles, and San Jose, and Pacific Legal Foundation indicated that the only remaining issue was the validity of the gasoline limitation regulation, 40 C.F.R. § 52.241. All other petitions for review were dismissed. [Order of Dismissal, *Community Redevelopment Agency of City of Hawthorne v. EPA,* 525 F.2d 1366 (9th Cir. 1975)].

The factual background of this appeal is reported in *Brown, supra* at 829–30. The remaining petitioners focus on that part of EPA's plans for implementing, maintaining, and enforcing the national ambient air quality standards which require reduction in the supply of gasoline to selected areas in California. 40 C.F.R. § 52.241 states:

§ 52.241 Gasoline limitations.

(a) Definitions:

(1) 'Distributor' means any person or entity that transports, stores, or causes the transportation or storage of gasoline between any refinery and any retail outlet.

(2) 'Retail outlet' means any establishment at which gasoline is sold or offered for sale to the public, or introduced into any vehicle.

(b) This regulation is applicable in the Metropolitan Los Angeles, San Francisco Bay Area, Sacramento Valley, San Joaquin Valley, and San Diego Intrastate Air Quality Control Regions (the 'Regions') to all distributors of gasoline to any retail outlet in the Regions, and to the owners and operators of all retail outlets in the Regions.

(c) If the Administrator determines, on the basis of air quality monitoring in the Regions, that the national ambient air quality standards for carbon monoxide and photochemical oxidants will not be attained in a Region by May 31, 1977, the

1. Act of Dec. 31, 1970, P.L. 91–604, 84 Stat. 1676, *amending* 42 U.S.C. § 1857 *et seq.* (Supp. V, 1969).

Administrator shall implement a program, to be effective no later than May 31, 1977, limiting the total gallonage of gasoline delivered to retail outlets in that Region to that amount which, when combusted, will not result in the ambient air quality standards being exceeded.

(d) All distributors to which this section applies shall provide the Administrator with a detailed annual accounting of the amount of gasoline delivered to each retail outlet in the Regions for calendar year 1976 and for each calendar year during which the gasoline limitation program is in effect. The owner or operator of each retail outlet to which this section applies shall provide the Administrator with a detailed accounting of gasoline received from each distributor, the total amount of gasoline sold during the year, and the amount of gasoline on hand at the beginning and end of the year, for each year during which the gasoline limitation program is in effect. All accountings required by this section shall be provided no later than 90 days after the end of the applicable year. The Administrator may require any other report that he may deem necessary for the implementation of this section.

While the regulation does not specify the extent of gasoline reduction which will be required in order to meet air quality standards, petitioners' objections to it are based on the belief that it will severely restrict if not eliminate the supply of gasoline in the several Air Quality Control Regions. At oral argument, the court asked EPA to supply information by affidavit detailing the extent of reductions now contemplated as necessary if the May 31, 1977 air quality deadline is to be met. Affidavits received from the national and regional administrators support petitioners' predictions.

The regional administrator, using the latest available air quality readings (1973) forecasts a 100% gasoline reduction in each of the five Air Quality Control Regions in order to meet the national ambient air quality standard. In addition to noting that this forecast was subject to revision based on later air quality readings, the regional administrator suggested that a 50% reduction in certain non-automobile emissions by May 31, 1977 would lessen the required gasoline reductions. If this were the case, these reductions would be necessary:

| Air Quality Control Region | Amount of Auto Gas Reduction |
|---|---|
| San Francisco Bay Intrastate | 52% |
| San Diego Intrastate | 68% |
| Sacramento Valley Intrastate | 31% |
| San Joaquin Valley Intrastate | None |
| Metropolitan Los Angeles Intrastate | 100% |

Given the magnitude of even the more optimistic level of gasoline reductions suggested by the regional administrator, all parties agree that implementation of 40 C.F.R. § 52.241 would produce extreme social and economic disruption. Perhaps for this reason, both the national and regional administrators have informed the court that they do not expect that this regulation will ever become effective.

The national administrator informed the court that he has publicly advocated amendments to the Act which would both defer the implementation date of transportation controls and allow the removal of gas rationing from a plan if it would have serious disruptive effects. He cited to us House and Senate versions of amendments to the Act now in the committee stage which, if enacted, would allow him to avoid implementing 40 C.F.R. § 52.241 on May 31, 1977. In light of the proposed amendments, the administrator urges us:

[t]o defer any ruling on this matter for a period of time sufficient to allow Congress to complete its debates and legislate appropriate relief.

(Affidavit of Russell Train at 8.)

Petitioners contend, on the other hand, that the regulation's implementation date is fast approaching and resolutions of the issue should not be delayed. They claim that "massive planning efforts" will be required prior to implementation in order to adjust to and ameliorate its effect. Consequently, postponement of a decision on the validity

of the regulation would prevent such planning if in fact it is necessary.

■ EPA's suggestion that we await Congressional action must be rejected. While revision of the Act is certainly within the proper scope of Congressional action, the regulation now before us has the force of law unless and until Congressional action is taken. To defer review of this regulation because of the possibility that the law will be altered would be an abdication of our responsibility. Moreover, we note that the parties seeking review of the regulation must undertake in advance substantial efforts to minimize its adverse effects. They cannot await the implementation date before acting.

The Act imposes upon the administrator the obligation to assure the attainment of the national ambient air quality standards by May 31, 1975. [42 U.S.C. § 1857c–5(a)(2)(A)(i)]. The administrator is permitted to provide a two-year extension of the deadline if the requirements outlined in 42 U.S.C. § 1857c–5(e) are met. This includes a determination that all "reasonably available alternatives" have been considered in an attempt to meet the original deadline. [42 U.S.C. § 1857c–5(e)(1)(B)]. *National Resources Defense Council, Inc. v. EPA,* 154 U.S.App.D.C. 384, 475 F.2d 968, 971 (1973). The administrator granted the maximum allowable extension here for the implementation of 40 C.F.R. § 52.241 because he determined that it would be socially and economically disruptive and, therefore, not a "reasonably available alternative." Social and economic disruptions resulting from an implementation plan have been held to permit the conclusion that the plan was not a "reasonably available alternative." *Friends of Earth v. EPA,* 499 F.2d 1118, 1127 (2d Cir. 1974).

While the administrator recognizes that the same possibilities which made the extension of the deadline proper still exist, he contends that he is foreclosed from further delaying the implementation of this plan.

[T]he Clean Air Act leaves the Administrator no alternative to promulgating all measures necessary to meet the standard by 1977. Accordingly, the plan also contains a provision for reducing the supply of gasoline to the extent necessary to ensure attainment of the standards by that date. Such a measure, if implemented, would achieve the air quality standards. However, the EPA does not believe that massive gasoline rationing is either socially acceptable or enforceable . . . . .

38 Fed.Reg. 31237. It is EPA's position that once all permissible extensions have been granted, it is bound by statute to implement the only available means for reaching the national air quality standard. At this stage, economic and social disruption are no longer cognizable factors.

■ Petitioners do not suggest that a "reasonably available alternative" means to achieve the air quality standards exists. Instead, they contend that despite the absence of alternatives, the regulation exceeds the administrator's authority because it is arbitrary, capricious and an abuse of discretion. Our standard of review in such cases is a narrow one. Our judgment is not to be substituted for that of the administrator. *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136, 153 (1971); *Pennsylvania v. EPA,* 500 F.2d 246, 250 (3d Cir. 1974).

Petitioners do not attack the regulation's use of gasoline rationing per se. They concede that some form of rationing may ultimately be required in conjunction with other pollution controls if the air quality standards are to be met. But they contend that the massive scale of rationing envisaged by this regulation exceeds the administrator's authority. We do not find support, statutory or otherwise, for this alleged limitation on the extent of permissible rationing under the Act.

The administrator has the authority to impose gasoline rationing. The Act requires, after rejection of the state plan, that he promulgate an implementation plan. 42 U.S.C. § 1857c–5(c). The plan must include "emission limitations" as pre-

scribed by 42 U.S.C. § 1857c–5(a)(2)(B). "Emission limitations" are all measures which "reduce the amount of emissions into the air." *National Resources Defense Council, Inc. v. EPA,* 489 F.2d 390, 394 n.2 (5th Cir. 1974), *rev'd on other grounds sub nom. Train v. NRDC,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Transportation controls are an appropriate means of limiting emissions and gasoline rationing or reduction is one form of transportation control. *Friends of the Earth, supra,* at 1127; *NRDC v. EPA, supra* at 394 n.2.

■ Concluding as we must that implementation of a gasoline reduction plan is within the scope of the administrator's authority we find no support for petitioners' assertion that there is a limitation on the extent of gasoline reduction permitted by the statute. Petitioners offer little authority to support their position. They cite the language of 42 U.S.C. § 1857g(a) which allows the administrator "to prescribe such regulations as are necessary to carry out his functions . . . ." for the proposition that 40 C.F.R. § 52.241 is unreasonable. But, having recognized that no alternative exists which is capable of attaining the requisite standards, petitioners have implicitly accepted the necessity of this regulation. In addition, since the Act authorizes the method employed by the administrator, § 1857g(a) does not support the assertion that the administrator was acting unreasonably in promulgating the regulation.

Petitioners also point to a portion of the legislative history of the 1970 amendments to the Clean Air Act which they contend indicates a Congressional intent to avoid disruption of a region's life style. But EPA cites other portions of the legislative history which indicate that some disruption would be unavoidable if the air quality standards were to be met. In light of the language of the Act which implicitly authorizes some gasoline rationing and the absence of any

language which would indicate that the extent of permissible rationing is limited, we need not resolve this apparent conflict in the legislative history.

We note also that while 42 U.S.C. § 1857c–5(e)(1)(B) permits the administrator to postpone the effective date of the regulation for up to two years if there is no "reasonably available alternative," there is no comparable language contained in the requirements for development of the alternate plan after the extension has been granted. Thus, while Congress indicated its desire to take social and economic factors into consideration when granting extensions, the lack of comparable language elsewhere indicates that those factors would not affect the implementation of the only plan available to meet the standards. *South Terminal Corp. v. EPA,* 504 F.2d 646, 675–76 (1st Cir. 1974).

In the absence of either a statutory limitation on the administrator's power to impose gasoline rationing, or the presence of an equally effective and less burdensome alternative, we may not overturn the regulation. We agree with the First Circuit which said:

> [N]either EPA nor this court has any right to decide that it is better to maintain pollutants at a level hazardous to health than to require the degree of public sacrifice needed to reduce them to tolerable limits.

*South Terminal Corp. v. EPA, supra* at 656. The gasoline limitation regulation [40 C.F.R. § 52.241] is neither arbitrary and capricious nor an abuse of discretion.

Petitioners next argue that the regulation is unconstitutional because it exceeds the scope of the commerce power [2] upon which Congress relied when it passed the Act. They recognize that Congress may properly regulate activities with only a minimal impact on commerce pursuant to this power,[3] but they contend that the com-

---

**2.** Art. I, § 8.

**3.** *See, e. g., Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 255, 85 S.Ct. 348,

356, 13 L.Ed.2d 258, 267 (1964); *Wickard v. Filburn,* 317 U.S. 111, 118, 63 S.Ct. 82, 85, 87 L.Ed. 122, 131 (1942).

merce clause may not be the source of the power to destroy commerce. Since petitioners believe that the regulation would have this effect in some regions of California, they urge us to disapprove it as beyond the scope of the commerce clause.[4]

The authority of Congress to regulate air pollution under the Clean Air Act pursuant to the commerce clause has previously been upheld in this case. *Brown, supra* at 837.[5] In so far as petitioners attack the effect of the regulation rather than the authority to regulate pollution, they do not offer nor could we find any cases to support their position.

■ The authority to regulate pollution carries with it the power to do so in a manner reasonably calculated to reach that end. Since petitioners do not deny that gasoline reduction is rationally related to its stated purpose, they cannot argue that it is beyond the administrator's authority.

■ Petitioners contend also that, regardless of the extent of the commerce power, whatever authority Congress had was granted exclusively to agencies of the Federal Government other than EPA pursuant to the Emergency Allocation Act of 1973 [15 U.S.C. § 751 *et seq.*] and the Federal Energy Administration Act of 1974 [15 U.S.C. § 761 *et seq.*]. We do not agree.

First, there is no express withdrawal of power from EPA to promulgate a gasoline reduction regulation. Moreover, the Clean Air Act was itself amended by the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. § 791 *et seq.*]. While this amendment did remove the administrator's authority to impose parking surcharge regulations, it did not refer to the authority to impose gasoline limitations. We cannot infer a Congressional intention to remove

EPA's authority to regulate gasoline supplies in this context.

Secondly, the apparent clash between the purposes of the Act on the one hand and those of the Emergency Petroleum Allocation Act and the Federal Energy Administration Act on the other cannot be resolved by this court. In the Clean Air Act, Congress stated that its purpose was in part "to protect and enhance the quality of the Nation's air." [42 U.S.C. § 1857(b)(1)]. The Emergency Petroleum Allocation Act seeks to "minim[ize] the adverse impacts of . . . shortages or dislocations on the American people and the domestic economy." [15 U.S.C. § 751(b)]. Both goals are legitimately within the scope of Congressional concern and action. Without a clear indication of Congressional intent, we will not attempt to assign a priority to either goal.

The situation in which petitioners find themselves is not an enviable one. Absent Congressional action, their constituents face substantial economic loss and social disruption as the result of gasoline reductions. We sympathize but we have no authority to alter the regulation. The relief which petitioners seek is in the hands of Congress, not the courts.

The petition for review must be denied.

---

4. In restating petitioners' argument, we do not imply that we accept it. Despite the immediate disruptions which it would likely produce, the ultimate effect of the regulation's implementation is at present unknown. In this light, we think it worth noting as did Congress in enacting the Act that the failure to attain the national air quality standards with its resultant detri-

mental effect on the health of the regions' citizens, might have a comparable effect on commerce.

5. Other courts have reached this conclusion. *South Terminal, supra* at 677; *Pennsylvania, supra* at 259.