**CITIZENS FOR A BETTER ENVIRONMENT, et al., Plaintiffs,**

v.

**George DEUKMEJIAN, Defendants.**

**SIERRA CLUB, Plaintiff,**

v.

**METROPOLITAN TRANSPORTATION COMMISSION, et al., Defendants.**

**Nos. C89–2044 TEH, C89–2064 TEH.**

United States District Court, N.D. California.

March 5, 1990.

Alan Ramo, Citizens for a Better Environment, Nicholas C. Arguimbau, Robert M. Teets, Jr., San Francisco, Cal., for Citizens for a Better Environment.

William S. Curtis and Alan Waltner of Gorman & Waltner, Oakland, Cal., for Sierra Club.

Francis Chin, Gen. Counsel, Melanie Morgan, Associate Gen. Counsel, Metropolitan Transp. Com'n, Oakland, Cal., John F. Powell, Counsel, Laurence G. Chaset, Senior Asst. Counsel, Thomas H. Crawford, Asst. Counsel, Bay Area Air Quality Management Dist., John K. Van De Kamp, Atty. Gen., Robert H. Connett, Asst. Atty. Gen., M. Anne Jennings, Deputy Atty. Gen., Charlotte Uram, Robert L. Hines, Landels, Ripley & Diamond, San Francisco, Cal., David P. Novello, U.S. E.P.A., Washington, D.C., Robert D. Wyatt, David D. Cooke, Kimberly M. McMorrow, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendants.

## OPINION AND ORDER

THELTON E. HENDERSON, District Judge.

In 1982, state and local agencies prepared a plan for achieving federal Clean

Air Act standards in the San Francisco Bay Area. This "1982 Bay Area Air Quality Plan" is the subject of these consolidated actions brought pursuant to section 304 of the Clean Air Act ("Act"), 42 U.S.C. § 7604. Plaintiffs, Citizens for a Better Environment ("CBE") and the Sierra Club, contend that there is no genuine dispute that defendants have failed to carry out several provisions of the 1982 Bay Area Air Quality Plan. They seek a summary judgment on liability, as well as imposition of a remedial scheme.

As the moving party, plaintiffs must demonstrate that no triable facts exist, and that they are entitled to judgment as a matter or law. Fed.R.Civ.P. 56. Defendants may defeat summary judgment by setting forth specific facts showing that genuine issues remain for trial. *Great Hawaiian Financial Corp. v. Aiu*, 863 F.2d 617, 619 (9th Cir.1988) (per curiam). Simply raising "some metaphysical doubt" as to the material facts will not suffice. *Allstate Insurance Co. v. Gilbert*, 852 F.2d 449, 453 (9th Cir.1988). Having carefully considered the parties' written and oral arguments, plaintiffs' motions are granted in part, and denied in part, for the reasons set forth below.[1]

## I.

### The Federal Clean Air Act

There is little more basic in life than the air we breath; yet early efforts by the states to control the "serious" and "unchecked" problem of air pollution met with only disappointing results. A frustrated Congress responded in 1970 by passing stringent amendments to the Clean Air Act. 42 U.S.C. §§ 7401 et seq; *Union Electric Co. v. Environmental Protection Agency*, 427 U.S. 246, 249, 256, 96 S.Ct., 2518, 2522, 2525, 49 L.Ed.2d 474 (1976); *Train v. Natural Resources Defense*

*Counsel, Inc.*, 421 U.S. 60, 63–65, 95 S.Ct. 1470, 1474–75, 43 L.Ed.2d 731 (1975).

The amendments directed the United States Environmental Protection Agency ("EPA") to set limits on the atmospheric concentrations that can be tolerated for pollutants that may endanger public health and welfare. 42 U.S.C. §§ 7408(a)(1)(A), 7409(b)(1). *Train*, 421 U.S. at 65, 95 S.Ct. at 1475. These limits, termed National Ambient Air Quality Standards or "NAAQS," represent the minimum standards deemed necessary to protect the public health and welfare. 42 U.S.C. § 7409(b)(1). NAAQS have been established for both carbon monoxide and ozone, two of the most harmful air pollutants.

Most are familiar with smog creating carbon monoxide, caused almost exclusively by vehicle exhaust fumes. 1982 Plan at 2. Less well known, albeit amply documented, are the detrimental effects of ozone which is formed by complex photochemical reactions involving hydrocarbons, nitrogen oxides, and sunlight. When present near ground level, ozone impairs lung functions, reduces resistance to infection, exacerebates asthma, bronchitis, and emphysema, alters blood chemistry or chromosome structure, destroys vegetation, reduces crop yield, and causes exposed materials to crack, fade and weather. It is also a prime ingredient of smog. *United States v. Ford Motor Co.*, 814 F.2d 1099, 1101 (6th Cir.1987); *Nat'l Resources Defense Counsel, Inc. ("NRDC") v. New York State Dep't of Environmental Conservation*, 668 F.Supp 848, 850 (S.D.N.Y.1987); *see also*, Air Resources Board, "Ambient Air Quality Standard for Ozone: Health and Welfare Effects" (September 1987);[2] 17 Cal.Admin.Code § 70200.

Once NAAQS were promulgated, the amendments required every state to develop, and submit for EPA approval, a State Implementation Plan or "SIP" for achiev-

---

**1.** This matter was argued before the Court on September 18 and 19, 1989, and a summary oral ruling was issued at that time. This opinion elaborates on the Court's reasoning underlying that ruling. It also resolves an issue taken under submission at that time concerning defendants' liability with respect to the stationary

source contingency provisions. A decision on the remaining issues taken under submission at that time will be issued separately.

**2.** CBE's unopposed request that this Court take judicial notice of this report is granted. Fed.R. Evid. 201.

ing and maintaining NAAQS no later than 1977. When it became evident that many states, including California, would not meet the 1977 deadline, Congress amended the Act again, this time mandating states with "nonattainment areas" to submit, by January 1, 1979, revised SIPs that contained strategies for achieving NAAQS no later than December 31, 1982.

States with especially severe pollution problems could receive an additional extension to December 31, 1987, if their revised SIPs demonstrated that NAAQS could not be attained by 1982, despite implementation of all reasonably available control measures. 42 U.S.C. § 7502(a)(2); *Delaney v. EPA*, 898 F.2d 687 (9th Cir.1990). However, "cognizant of the already lengthy history of delays and disappointments that had characterized previous efforts to combat pollution," *Connecticut Fund for Environment, Inc. v. EPA*, 672 F.2d 998, 1001 (2nd Cir.1982), *cert. denied sub nom.*, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982), this extra extension was conditioned on states submitting a second revised SIP by July 1, 1982, which contained additional cleanup provisions and *enforceable measures to assure attainment* of NAAQS by 1987. 42 U.S.C. § 7502(c); *American Lung Ass'n v. Kean*, 670 F.Supp 1285, 1288 (D.N.J.1987), *aff'd*, 871 F.2d 319 (1989).

Again, California failed to meet the Clean Air Act deadlines. It did not submit a revised SIP by January 1979, and the SIP it ultimately presented was disapproved by EPA in 1980. Once EPA finally approved a second revised SIP in 1983, the State was required to carry it out. *American Lung Ass'n*, 871 F.2d at 322 ("SIPs are not merely advisory; once EPA approves a SIP the state is obligated to comply with it"); *Friends of the Earth v. Carey*, 535 F.2d 165, 169 (2nd Cir.1976), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *NRDC v. New York*, 668 F.Supp. at 850–51.[3]

That portion of the SIP applicable to the San Francisco Bay region (a "non-attainment area") is the "1982 Bay Area Air Quality Plan" ("1982 Plan" or "Plan"). Prepared by defendants Bay Area Air Quality Management District ("District" or "BAAQMD"), the Metropolitan Transportation Commission ("MTC"), and the Association of Bay Area Governments ("ABAG"),[4] it contained a "technically justified program that adopts and *commits to implement control measures that will result in the attainment of the O3 [ozone] and CO [carbon monoxide] standards no later than 1987*, and will provide for reasonable further progress in the interim ..." 1982 Plan at 33 (emph. added); *see also* Plan at 1. It is now 1990—twenty years after the 1970 amendments to the Clean Air Act, and two years after the 1987 deadline—and the San Francisco Bay Area, while perhaps not the worst offender, still has not attained NAAQS for either ozone or carbon monoxide.[5]

**3.** States may obtain a formal modification or postponement of a SIP pursuant to sections 110(a)(3) and 110(f) of the Act. 42 U.S.C. § 7410(a)(3), 7410(f). In all other circumstances, however, states are "relegated to a lone option: compliance." *Friends of the Earth*, 535 F.2d at 178. *United States v. Ford*, 814 F.2d at 1103 (Plan emission limits remain fully enforceable absent a revision or variance approved by both the State and EPA); *see also, Train*, 421 U.S. at 89–90, 95 S.Ct. at 1486–87.

**4.** Other defendants named in the complaints are George Deukmejian, in his official capacity as Governor of the State of California, James Boyd, in his official capacity as Executive Officer of the California Air Resources Board, the United States Environmental Protection Agency (EPA), William K. Reilly, in his official capacity as Administrator of the EPA, and Daniel Mc-

Govern, in his official capacity as Regional Administrator for Region IX of the EPA. Plaintiffs' claims against the EPA defendants are not at issue in the instant motions. In addition, the American Bakers Association was granted permissive intervention with respect to remedies issues affecting large commercial bakeries.

**5.** February 24, 1989 EPA letter at 2, Exh. 4 in Support of CBE's motion for summary judgment (stating that the Bay Area "failed to meet the 1982 Plan's emission reduction targets for ozone and carbon monoxide"). In fact, on May 28, 1988, EPA notified Governor Deukmejian that the SIP for the San Francisco Bay Area was "substantially inadequate" to attain NAAQS for both ozone and carbon monoxide, and required the Governor to submit a revised SIP for the Bay Area by September 30, 1991. May 26, June 13, 1988, and June 13, 1989 EPA letters, Exhs.

## II.

### *The 1982 Plan*

According to the 1982 Plan, the Bay Area would attain NAAQS by 1987 primarily through a motor vehicle inspection and maintenance program (I/M Program) and implementation of control measures which, in combination, would reduce hydrocarbon emissions by 85 tons/day. Plan at 101, and Table 1. In the event the Bay Area failed to make sufficient progress toward attaining NAAQS, the Plan called for the implementation of contingency measures to further reduce emissions from both the transportation and stationary source sectors. Plan at 3.

### A. *Stationary source controls*

Most of the 85 tons/day reduction (56 tons) was to be attained through the phasing in of control measures for 23 stationary sources of hydrocarbon emissions between 1983 and 1987. As of September 19, 1989, controls for four of these sources—which were to account for over 20 percent of the 56 ton/day reduction—had yet to be adopted, much less implemented. They are summarized as follows:

(1) reciprocating engines
(4.0 tons/day),
—scheduled adoption date: 1984

(2) pesticides
(3.7 tons/day)
—scheduled adoption date: 1984

(3) consumer solvents
(4.0 tons/day)
—scheduled adoption date: 1985

(4) large commercial bakeries
(1.1 tons/day)
—scheduled adoption date: 1986

The remaining 29 tons/day reduction was to be accomplished through the I/M Pro-

gram, which is not at issue in this case. Plan at 94, 101.

### B. *Contingency plans*

If interim reports showed the Bay Area was not making "reasonable further progress" ("RFP") toward attaining NAAQS or that adoption of required measures had been delayed, the Plan called for the adoption and implementation of contingency measures. 1982 Plan at 3, 34, 101, 150. With respect to *stationary sources*, the Plan identifies several potential additional measures for reducing ozone, beyond the mandated 23 measures, although other unidentified measures could be adopted as well. Plan at 99, 101. A number of such contingency measures were adopted or are to be considered for adoption; however, plaintiffs contend that more measures are necessary to attain NAAQS.

With respect to the *transportation sector*, the Plan calls for MTC to consider delaying highway projects that are shown to have a significant adverse impact on air quality. It also requires MTC to adopt enough "transportation control measures" ("TCMs")—within six months of a determination that RFP is not being met—to bring the region back "within the RFP line." 1982 Plan at 106–07, Appendix H.[6] Despite unsatisfactory RFP reports, MTC delayed implementing the transportation contingency plan. As of June 13, 1989, when these actions were commenced, MTC had neither considered the delay of highway projects identified as having potentially adverse air quality impacts nor adopted any additional TCMS.

## III.

### *Plaintiffs' Motions For Summary Judgment*

Plaintiffs assert that defendants are liable for failing to (1) adopt and implement

1–2, and 7 in Support of CBE's motion for summary judgment. The 1988 California Clean Air Act requires the State to satisfy significantly more stringent standards for automotive hydrocarbon emissions than those imposed by the federal Clean Air Act. The California standards, however, are not at issue in this case.

**6.** Some random examples of possible TCMs are bridge toll increases, smog fees based on auto

emissions levels, tax credits for transit users, extension of regional rail systems, provision of additional passenger parking and feeder service, increased subsidies for transit and carpool/vanpools, increased bicycle parking, storage and security facilities, coordination of signal timing on local street systems, buy backs of older (more polluting) automobiles, and enactment of "balanced growth" ordinances.

the four stationary source control measures identified above, (2) carry out the contingency plan for stationary sources, and (3) carry out the contingency plan for the transportation sector. Defendants, on the other hand, challenge plaintiffs' standing to enforce those parts of the 1982 Plan that they have allegedly failed to carry out. Alternatively, certain agencies argue that they have either complied with their obligations under the Plan, or that at least triable issues remain concerning compliance.

### A. *Standing*

Eager to improve the Nation's record in achieving clean air, Congress amended the Act in 1970 to allow any person to bring a "citizen's suit" to enforce local air quality plans. 42 U.S.C. § 7604(a). "Congress made clear that citizen groups are not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests ... [when] administrative enforcement might falter or stall .." *Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2nd Cir.1976); *see also*, Senate Committee on Public Works, S.Rep. No. 91–1196, 91st Cong., 2d Sess. at 20, 35–36 (1970); *cf.*, *Student Public Interest Research Group v. Fritzsche, Dodge & Olcott*, 579 F.Supp. 1528, 1535 (D.N.J.1984), *aff'd*, 759 F.2d 1131 (3rd Cir. 1985) (expressing same sentiment with respect to analogous citizen's suit provision in Clean Water Act).

■ The scope of a citizen's enforcement suit, however, is not unlimited. As defendants emphasize, a person may not sue to force the State to simply "attain NAAQS" or to modify or amend a SIP to conform to a plaintiff's own notion of proper environmental policy. *Wilder v. Thomas*, 854 F.2d 605, 613–616 (2nd Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989). Rather, citizens are confined to

challenging a state's failure to enforce an *emission standard or limitation set forth in a SIP.* 42 U.S.C. § 7604.[7]

The Act defines emissions standard or limitation, for our purposes, as "(1) a *schedule or timetable of compliance, emission limitation,* standard of performance or emission standard, ... or (3) ... any condition or *requirement under an applicable implementation plan relating to transportation control measures, [or] air quality maintenance plans ...*" 42 U.S.C. § 7604(f) (emph. added). Put more simply, an emissions standard or limitation is broadly construed as "any type of control to reduce the amount of emissions into the air." *NRDC v. EPA*, 489 F.2d 390, 394, n. 2 (5th Cir.1974), *rev'd on other grounds sub nom. Train v. NRDC*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *City of Santa Rosa v. EPA*, 534 F.2d 150, 154 (9th Cir.1976), *remanded on other grounds sub nom. Pacific Legal Foundation v. EPA*, 429 U.S. 990, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976).

■ Thus, while this Court is not empowered to enforce the Plan's overall objectives [8]—or NAAQS—directly, it can and indeed, must, enforce specific strategies committed to in the Plan. *Action for Rational Transit v. West Side Highway*, 699 F.2d 614, 616 (2nd Cir.1983) ("aims and goals of the SIP are not enforceable apart from the specific measures designed to achieve them"); *NRDC v. New York*, 668 F.Supp at 854 ("[U]nder the Clean Air Act, this court has the authority and indeed the responsibility to enforce the provisions of [a] SIP").

We conclude, for the reasons below, that plaintiffs having standing to enforce the provisions of the Plan at issue in this case.

### 1. *The four stationary sources*

■ The Plan unequivocally provides that "[i]f this Plan is approved [by EPA],

---

**7.** 42 U.S.C. § 7604(a) states, in part, that "any person may commence a civil action on his own behalf—(1) against any person (including (i) the United States, and (ii) and other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an

emission standard or limitation under this chapter ..."

**8.** The "goal of the 1982 [Plan] is to achieve the ambient air quality standards in the Bay Area by 1987 by *controlling* pollutant emissions." Plan at 150.

the first twenty-three [stationary source] measures, [which include the four stationary sources at issue] down through 'Letterpress/Offset Printing,' *will be implemented as new regulations by the BAAQMD.*" Plan at 101 (emph. added). If this language does not evidence a commitment to carry out a specific strategy, the Court would be hard pressed to coin a phrase that did. Moreover, the 23 measures are no minor matter; rather they are at the core of the Plan's strategy, accounting for 56 of the 85 tons/day reduction that the Plan represented would be achieved.

■ Notwithstanding the above, the District denies any commitment to adopt the 23 measures because the Plan at times describes them in a tentative or prospective manner. For example, the Plan at page four states that "[t]wenty-three new regulations are *proposed* by the Bay Area Air Quality Management District for implementation" (emph. added). It is obvious, however, that terms such as "proposed" and "recommended" were used because the Plan was submitted to EPA as a proposal. Indeed, by definition the entire Plan was "tentative" until approved by the Agency. Once approved, however, the Plan became mandatory. *Friends of the Earth*, 535 F.2d at 169 (approved SIP is "controlling and must be carried out by the State"). The District can not escape its commitments simply because the Plan was prepared in proposal form. *American Lung Ass'n*, 670 F.Supp. at 1290–91.

■ The District also relies on an affidavit by the District's Air Pollution Control Officer, which essentially states that the District never intended to commit to implementation of all 23 stationary source measures. Feldstein Decl. at ¶ 4–5. This af-

ter-the-fact declaration deserves no weight; even assuming the District actually harbored some unexpressed intent that the 23 measures only represent "suggestions," such intent is irrelevant given that SIP strategies are mandatory and enforceable upon EPA approval.

Moreover, the Court finds this aspect of the declaration particularly disingenuous, given the District's obligation to submit for EPA approval a SIP containing *enforceable* strategies for achieving NAAQS by 1987. 42 U.S.C. § 7502(a)(2), (c); *Connecticut Fund for Environment, Inc. v. EPA*, 672 F.2d 998, 1001 (2nd Cir.1982), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982) (SIP "must contain, in enforceable form, all measures needed for attainment"); 46 Fed.Reg. 7182, 7186 (Jan. 22, 1981). The District can not represent to EPA that the Plan contains enforceable strategies when seeking its approval to avoid the specter of sanctions, but then represent to this Court that it never intended those strategies to be enforceable.[9]

■ Third, the District contends that ordering adoption of stationary source measures by a certain time, without first allowing a public hearing on the advisability of such a course would run afoul of Cal.Health & Safety Code §§ 40725–27. These sections, however, were not enacted until 1986; at the time the 1982 Plan was adopted, their predecessor, former Health and Safety Code § 40703, provided only that a "district board shall not adopt, amend, or repeal any rule or regulation without first holding a public hearing thereon." The 1982 Plan incorporates this provision when it states that "the state Health and Safety Code requires public notice and hearings prior to actual adoption of a regulation ..." Plan at 101.[10]

---

9. When California failed to comply with the January 1, 1979 statutory deadline, EPA imposed a moratorium on the issuance of permits under the Clean Air Act for major new or modified facilities. 48 Fed.Reg. 53115 (Nov. 25, 1983); 44 Fed.Reg. 38471–73 (July 2, 1979). When EPA disapproved the State's revised SIP in 1980 additional sanctions were imposed including the loss of federal grant funds for the San Francisco Bay Area. 45 Fed.Reg. 81476 (Dec. 12, 1980). Once the instant Plan was

approved, sanctions were lifted. 48 Fed.Reg. 53117 (Nov. 25, 1983); *see generally*, 42 U.S.C. §§ 7410(a)(2)(I), 7506(a) (sanctions for failure to submit SIP), and 42 U.S.C. §§ 7503, 7506(b) (sanctions for failure to enforce).

10. To the extent the District or American Bakers Association argue that Health & Safety Code §§ 40726–28, which essentially elaborate on former section 40703, serve to amend the 1982 Plan, this argument must be rejected. States may not amend a SIP through the enactment of

Thus, to accept the District's argument would require the Court to find the Plan internally inconsistent—because enforcing one part of the Plan (the stationary source plan) would violate another (the public hearing provision). Traditional rules of construction counsel against such a result, where as here, it can be reasonably avoided. *Cf., Hughes Air Corp. v. Public Utilities Comm'n*, 644 F.2d 1334, 1338 (9th Cir. 1981) ("basic rule of statutory construction is that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless").

It is readily apparent that the public hearings referenced in the Plan are for the purpose of addressing the specific shape and form of the 23 stationary source measures—not whether they should be undertaken at all or the amount of emissions reduction to be achieved thereby. Indeed, this is the only reasonable construction. These latter matters having already been determined by the Plan,[11] and having been rendered mandatory by virtue of EPA's approval, are binding on the District. They are not subject to reassessment by a future public hearing. *Cf. NRDC v. New York*, 668 F.Supp. at 854–855 (state rule-making process can not interfere with federal en-

forcement of SIP). Thus, the public hearing requirement does not defeat plaintiffs' standing to enforce the four stationary source measures at issue.

### 2. *Stationary source contingency provisions*

■ If the non-contingent provisions of the Plan prove insufficient "to demonstrate attainment and reasonable further progress within the statutory time frame, then additional measures *must* be identified, evaluated, and adopted." Plan at 34 (emph. added); *see also*, Plan at 150 ("if emissions are not decreasing at rates that will allow standard attainment by 1987, then further controls *must be adopted and implemented*") (emph. added).[12] The Plan identifies a number of potential contingency measures for stationary sources but does not commit to any particular one.

Although the ARB previously acknowledged the Plan's commitment to adopt stationary source contingency measures if emission targets were not met,[13] it now disavows any such commitment because the Plan does not mandate adoption of any *particular* contingency stationary source measure.[14]

This latter position can not be reconciled with the mandate that SIPs contain "*in*

---

subsequent state law. *NRDC v. EPA*, 478 F.2d 875, 888 (1st Cir.1973) ("Congress plainly intended the federal [Clean Air Act] and regulations promulgated thereunder to take precedence over state laws and regulations"); *see also, Friends of the Earth*, 535 F.2d at 178–179 (procedure set forth in Clean Air Act for obtaining modification of SIP is *exclusive* method by which a SIP amendment can be effected).

**11.** We also note that the strategies set forth in the Plan, including the adoption and implementation of the 23 stationary source measures, and *the amount of tonnage to be reduced thereby* were only arrived at after substantial public input. 1982 Plan, J–1–35.

**12.** *See also*, Plan at 3 ("the contingency component [of the Plan] contains those control measures that are recommended for later evaluation and implementation if it is demonstrated that reasonable further progress toward attainment of federal standards cannot be achieved with the primary measures"); Plan at 101. EPA has also interpreted the Plan to "include provisions to adopt contingency measures for both ozone

and carbon monoxide if reasonable further progress is not achieved." February 24, 1989 EPA letter at 2, Exh. 4 in Support of CBE's Motion for Summary Judgment.

**13.** *See* ARB resolution, No. 89–31, dated March 10, 1989, which states in part:
 "Whereas, [the 1982 Plan] contain[s] measures and commitments to adopt additional measures to control carbon monoxide (CO) emissions and emissions of ozone precursors ..
 Whereas, the 1982 Plan included provisions to adopt contingency measures for ozone and CO if emission reduction targets were not met ...
 Whereas, federal law requires that measures committed to in the SIP be adopted and implemented on schedule ..."
Exh. 5 in Support of CBE's motion for Summary Judgment, at ¶¶ 2, 3, and 5.

**14.** The Plan did identify ten additional stationary source control measures, ranked immediately below the required 23 in terms of cost-effectiveness, but did not require that those particular measures be utilized in the event contingency measures were needed. *See* Plan at 99, 101.

*enforceable form,* all measures needed for attainment." *Connecticut Fund,* 672 F.2d at 1001 (emph. added). Where, as here, the SIP expressly calls for contingency measures in specific circumstances, the contingency plan is necessarily an integral and indispensable component of the SIP. Indeed, absent the contingency measures, it is doubtful the 1982 Plan could have won EPA approval.[15]

Additionally, the promise to implement additional measures, should the Bay Area fail to make sufficient progress toward reducing ozone levels, is expressed in unambiguous terms. We discern no principled basis, consistent with the Clean Air Act, for disregarding this unequivocal commitment simply because the particulars of the contingency measures are not provided. Thus, we hold that the basic commitment to adopt and implement additional measures, should the identified conditions occur, constitutes a specific strategy, fully enforceable in a citizens action, although the exact contours of those measures are not spelled out.

Our holding finds support in *Atlantic Terminal Urban Renewal Area Coalition v. New York City Dep't of Environmental Protection,* 697 F.Supp. 157 (S.D.N.Y. 1988). In that case, the plaintiffs sought to enforce a provision in New York's SIP which required New York City to take affirmative, albeit unspecified steps, to reduce carbon monoxide emissions if an environmental impact statement for a project identified a violation or exacerbation of the Carbon monoxide standard. The Court found the provision was enforceable in a citizens' action because the provision at issue "contains a commitment on the part of the City to act, and thereby does more than restate a goal [to meet NAAQS]." *Id.* at 161–162. Similarly, here, the stationary source contingency provisions represent an unequivocal promise to act that is independent of the Plan's overall objectives.

### 3. *Transportation contingency measures*

■ Finally, we turn to plaintiffs' standing to enforce the contingency plan for the transportation sector. As summarized earlier, the first component provides as follows:

"If the RFP [reasonable further progress] target is not met, MTC may delay certain categories of projects in the TIP [Transportation Improvement Program] if they are shown to have significant adverse impact on air quality. The criteria for delaying projects and specific projects to be delayed will be determined following the initial public hearing under section b."

Plan at H–2.[16]

Because the language does not mandate delay of any particular transportation project, but only provides a process for the discretionary delay of certain projects, MTC contends the measure is unenforceable. We reject this argument for the same reasons we reject the argument that the stationary source contingency provisions are unenforceable because they fail to identify the precise contingency measures to be adopted. And while MTC only committed to a "process" and not a specific result, there is no reason why a process, plainly spelled out, can not constitute a valid, identifiable strategy for achieving Plan objectives. Thus, we conclude that the "process" committed to in the 1982 Plan is fully enforceable in this citizen's action.

The transportation contingency plan also provides that:

"If a determination is made that RFP is not being met for the transportation sector, MTC *will adopt* additional TCMS [Transportation Control Measures] *with-*

---

**15.** The Plan specifically acknowledges that "EPA has developed requirements for contingency planning," Plan at 101, and that "contingency measures are identified to satisfy EPA guidelines for approval of 1982 SIP revisions." Plan at 133. *See also,* 46 Fed.Reg. 7182, 7186, 7188 (Jan. 22, 1981)

**16.** The categories which may be delayed include: freeway congestion relief projects, freeway traffic service projects, conventional highway and expressway operational improvement projects, new connections and cross-traffic improvements, upgraded facilities, lane additions, new highways, and projects funded by the Federal Aid Urban Program which increase roadway capacity. Plan at H–2.

*in 6 months of the determination.* These TCMs will be designed to bring the region back within the RFP line."

Plan at H-2 (emph. added).

On its face, this language is both specific and mandatory.[17] Nonetheless ARB and MTC argue that it is too uncertain to constitute an enforceable strategy, primarily because it fails to specify exactly which TCM's must be adopted. Again, we reject this argument for the same reasons discussed above.[18]

MTC also argues that the provision is unenforceable because the decision whether RFP has been made is a "discretionary" one. Any discretionary aspect of this determination, however, is irrelevant to the unambiguous requirement that *once* it is determined that RFP has not been made, MTC *must* adopt additional TCM's within six months.

MTC's final argument is no less spurious. It contends that the six month deadline is not enforceable because it is not statutorily mandated by the Clean Air Act; rather it is only an "administrative schedule" that should be construed with a reasonable degree of flexibility. While we would not deny MTC some "reasonable" degree of flexibility, MTC's approach suggests a fundamental misunderstanding of the Clean Air Act—which specifically makes SIP "timetables for compliance" relating to emissions strategies enforceable in federal court. 42 U.S.C. § 7604(f).

To recap, defendants paint the 1982 Plan as an advisory document containing "suggestions" and "recommendations" but no commitments to implement any particular strategy by any definite time. As dis-

cussed above, such a view is contradicted by the plain language of the Plan, inconsistent with case precedent, and contrary to the Act itself. Defendants' arguments that plaintiffs lack standing to enforce the provisions of the 1982 Plan at issue are therefore rejected.

## B. *Liability*

 Liability in a citizen's enforcement action turns solely on the question of actual compliance. States have an unwavering obligation to carry out federally mandated SIPs; thus, where a SIP is violated, liability attaches, regardless of the reasons for the violation. *NRDC v. New York,* 668 F.Supp at 852. Thus, this Court need not concern itself with "reasonable efforts" to comply, agency intentions, the predicted efficacy of the Plan, or the state's national reputation for ozone control. Such factors are immaterial to the singular issue whether the Bay Area has, in fact, "complied with its own federally mandated plan." *American Lung Ass'n,* 670 F.Supp at 1289; *NRDC v. New York,* 668 F.Supp. at 852.[19]

 No one disputes that, as of the hearing in this matter, no control measures had been adopted, much less implemented, for the four stationary sources at issue— large bakeries, consumer solvents, pesticides, and reciprocating engines. Liability for this failure is beyond question and essentially uncontested.

However, as to the remaining strategies at issue, defendants argue that they should not be found liable because a) they have complied with the relevant provisions or b) there are at least triable issues of fact with respect to their compliance.

---

**17.** *See also* Plan at 7 ("Selection of [contingency transportation measures] will take place within six months of a determination that reasonable further progress toward attainment of the ozone standard is not being made"), and at J-31 ("[the transportation contingency plan] is a *commitment to analyze and adopt additional TCMS within 6 months* of a determination that RFP is not being met") (emph. partly added and partly in original).

**18.** ARB also remarkably asserts that the above provision only represents "a commitment to *consider* a range of options if necessary to main-

tain further progress toward attainment of the NAAQS." ARB Opposition to Sierra Club's August 17, 1989 Motion for Summary Judgment at 5 (emph. in original). Such an assertion ignores the Plan's plain language *mandating* adoption of TCM's under certain circumstances.

**19.** As noted earlier, States may modify their obligations under an EPA approved SIP through the revision process provided by the Clean Air Act. Absent such a modification, however (which state and local defendants have never sought), the SIP remains binding. *See supra,* n. 3.

## 1. Contingency measures for stationary sources

■ The Plan commits to adoption of contingency measures if RFP is lacking. *See e.g.,* Plan at 34. According to EPA, the Bay Area failed to achieve RFP for carbon monoxide for the years 1983, 1984, 1985, 1986, and 1987, and failed to achieve RFP for ozone for the years 1986 and 1987. Exh. 2 to Sierra Club's September 7, 1989 Reply Memorandum.[20] The deadlines for adopting and implementing the four stationary source control measures discussed above were also missed. There is no question, then, that the contingency provisions have been triggered for some time.

Less clear, however, is whether defendants are in violation of those provisions with respect to stationary sources. In plaintiffs' view, they require adoption of sufficient additional stationary source control measures to attain NAAQS. Plaintiffs acknowledge that defendants have adopted some contingency measures for stationary sources; however, because such measures are inadequate to attain NAAQS, they claim that defendants are liable for failing to comply with this aspect of the Plan.

As discussed earlier, this Court may not enforce the overall goals of a SIP, apart from the specific strategies designed to achieve them. *Action for Rational Transit,* 699 F.2d at 616. The flaw in plaintiffs' argument is that the Plan fails to explicitly require, as a strategy, enactment of sufficient contingency measures for stationary sources *such that NAAQS will be met.* The Plan clearly requires the adoption of contingency measures upon a showing that RFP has not been made; however, plain-tiffs are unable to point to any language that expressly links the number of such measures to the attainment of NAAQS or expressly commits to sufficient contingency measures to attain NAAQS.[21] While such a commitment may seem to logically flow from the Plan, the Court is not at liberty to extrapolate from the Plan or flesh out strategies not expressly contained therein. To do so would impossibly blur the line between enforcing specific SIP strategies and enforcing the SIP's overall goals—or NAAQS directly—which this Court is not permitted to do.

Limited as we are, to the language of the Plan, the Court must find that defendants are not liable for violation of the contingency provisions for stationary sources. If no significant stationary source contingency measures had been adopted, a violation of the Plan's commitment to adopt additional stationary source measures in the absence of RFP would be clear. However, between 1984 and 1987 the district adopted 9 stationary source contingency measures which, upon full implementation are expected to reduce hydrocarbon emissions by 14.5 —15.5 tons/day. The District also passed a resolution in March of 1989 which resolved to consider for adoption and implementation 18 additional stationary source contingency measures.[22] In light of this record, we can not find defendants in violation of the contingency provisions with respect to stationary sources.

## 2. Contingency measures for the transportation sector

■ Although RFP was not met for carbon monoxide for various years, *see supra* page 1459 and n. 20, as of September

---

**20.** *See also,* Air Quality Planning in the Bay Area: 1988 Status Report (March 1988); Bay Area Air Quality RFP Reports: A Retrospective Assessment of 1985 and 1986 (July 1988); Bay Area Air Quality 1987 RFP Report at 30, 59 (November 1988). According to the Bay Area Air Quality 1987 RFP Report, prepared by ABAG, MTC, and the District, the shortfall in emission reductions was largely attributable to "the reduced effectiveness of [the I/M Program] and to the stationary source measures that have not yet been adopted." *Id.* at 30.

**21.** For example, the Plan states that "if emissions are not decreasing at rates that will allow standard attainment by 1987, then further controls must be adopted and implemented." Plan at 150. In comparison, the language governing the transportation contingency plan expressly requires the adoption of TCMs "designed to bring the region back within the RFP line." Plan at H–2.

**22.** The resolution was passed in response to a February 24, 1989 letter from EPA requiring the District to submit an updated schedule that provides for the expeditious adoption and implementation of additional ozone contingency measures.

19, 1989, MTC had failed to implement the contingency plan for the transportation sector. As of September 19, 1989, it had not (a) considered delaying certain projects after determining the criteria for delaying projects [23] or (b) adopted additional TCMs sufficient to bring the region back within the RFP line within six months of a determination that RFP was not being met.[24] Plan at H–2.

Nonetheless, MTC contests liability on the ground that its obligation to implement the transportation contingency plan was not triggered until EPA formally directed implementation on July 10, 1989. It contends that steps taken thereafter to implement the contingency plan should be sufficient to avert a finding of a liability.[25]

We conclude that MTC's efforts are too little and come far too late to avoid liability. Nowhere does the 1982 Plan condition MTC's duty to implement the contingency plan on formal direction from EPA. On the contrary, the Plan is very clear that MTC must activate the contingency plan

upon a determination that RFP has not been made. Plan at H–2.[26] While the Clean Air Act has been described as "detailed, technical [and] complex," *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 848, 104 S.Ct. 2778, 2785, 81 L.Ed.2d 694 (1984), if anything is clear it is that SIP commitments are enforceable independent of agency action. Indeed, the Act provides for citizen suits precisely to "circumvent bureaucratic inaction that interferes with the scheduled satisfaction of the federal air quality goals." *Friends of the Earth,* 535 F.2d at 173. Thus, MTC can not escape liability by substituting EPA timetables for its own SIP schedule. Accordingly, MTC is liable for failing to implement the transportation contingency provisions of the 1982 Plan.[27]

To summarize then, the Court finds that the District and the Air Resources Board are liable for failing to adopt and implement control measures designed to achieve at least the target emissions reductions set forth in the 1982 Plan for (a) consumer

**23.** The full provision states: "[I]f the RFP target is not met, MTC may delay certain categories of projects in the TIP if they are shown to have significant adverse impact on air quality. The criteria for delaying projects and specific projects to be delayed will be determined following the initial public hearing under section b."

**24.** The full provision states: "If a determination is made that RFP is not being met for the transportation sector, MTC will adopt additional TCMs within 6 months of the determination. These TCMs will be designed to bring the region back within the RFP line."

**25.** Subsequent to July 10, 1989, and receiving plaintiffs' notices of intent to sue, MTC announced that it would hold a public hearing on August 25, 1989 for the purpose of receiving public comment on a proposed "Draft Implementation Plan for the Contingency Plan in the 1982 Plan." A second hearing was also scheduled for sometime in February 1990.

**26.** It is not altogether clear whether the transportation contingency plan is triggered if RFP is not made for either ozone or carbon monoxide, or just carbon monoxide. We need not resolve this matter, however, as RFP was not made for either pollutant.

**27.** Plaintiffs contend that the transportation contingency plan was first triggered in April 1986 when EPA found that RFP had not been

made for carbon monoxide for the year 1983. MTC, on the other hand, argues that the finding had no effect because it was based on a "lack of information." *See* Hein Suppl. Decl. at 6, and Exh. 3. This opinion was apparently not shared by EPA because on October 21, 1986 it inquired why MTC had not adopted any additional TCMs given that "a determination of failure to meet RFP for CO for CY–83 was made by EPA and transmitted to you on April 18, 1986." *Id.* at Exh. 3. MTC responds that it subsequently "negotiated" with EPA to provide additional information for the year 1985 and that this agreement "superseded" any obligation to implement the contingency plan. *Id.* at 6. "Negotiations" with EPA, however, do not vitiate obligations otherwise owed under a SIP. *Friends of the Earth,* 535 F.2d at 178 ("[I]t is . . . clear that the [Act] empowers neither the EPA nor the State to delay the approved Plan's strategies through negotiations, be they formal or otherwise. Negotiations are no substitute for enforcement and for timely compliance with the Plan's mandated strategies").

Moreover, even putting aside the 1986 RFP report, MTC can not demonstrate compliance. By July 1988, it had been determined that RFP had not been made for carbon monoxide in 1985 and 1986, and a November 1988 report found a lack of RFP for carbon monoxide for 1987. *See* n. 20 *supra.* Yet, as of September 19, 1989, approximately one year later, no additional TCMs had been adopted.

solvents, (b) pesticides, (c) reciprocating engines, and (d) large commercial bakeries. MTC is liable for failing to implement the transportation contingency plan. Plaintiffs' motions for summary judgment are granted with respect to these matters, there being no genuine dispute of material fact and plaintiffs having demonstrated entitlement to relief as a matter of law. However, plaintiffs' motions are denied with respect to the Plan's provisions for contingency measures for stationary sources.

## IV.

### *Remedy*

■ Plaintiffs urge the Court to impose a remedial timetable concurrently with this ruling on liability, while defendants urge the Court to refrain from, or at least delay, granting any injunctive relief. They contend that given recent agency actions, or promises to act, injunctive relief is unnecessary to ensure compliance. However, given the past history with respect to the measures at issue, we conclude that this Court's involvement is necessary and perhaps crucial to ensuring timely compliance and enforcement. *See also, Friends of the Earth,* 535 F.2d at 173 (courts are "obligated, upon a showing that the state has violated the plan, to issue upon a showing that the state has violated the plan, to appropriate orders for its enforcement"). We also conclude that defendants' request for further delay is not justified. Compliance with this Plan being long overdue, time is of the essence. Given the special briefing schedule, defendants and intervenor have also had more than ample opportunity to respond to the remedial issues that were squarely put before the Court by plaintiffs' papers and proposed orders. Accordingly, the Court sets the following timetable for compliance with the 1982 Plan:

1. The District or the ARB, as specified, shall adopt, implement, and enforce control measures, for the following classes of stationary sources, that are designed to achieve at least the target emission reductions described in the 1982 Plan as follows:

(a) Large commercial bakers: adoption by District by September 30, 1989.

(b) Pesticides: adoption by the ARB by June 1, 1990.

(c) Reciprocating engines: adoption by the District or ARB by June 1, 1990.

(d) Consumer solvents: adoption by the District or Air Resources Board by June 1, 1990.[28]

Counsel for plaintiffs, the District, and the Air Resources Board, are to meet and confer within 20 days of September 19, 1989, to attempt to agree upon final implementation dates for the above four rules. Intervenor's counsel may join in the meet and confer with respect to the bakery rule. Within 35 days of September 19, 1989, the above counsel shall either submit a stipulation with respect to implementation dates or a statement that no agreement was reached with an explanation of the parties' respective positions and supporting affidavits, if appropriate. The Court will then impose an implementation date. If necessary, the Court will order the appointment of a neutral expert at the expense of the parties to aid in this determination.[29]

2. The Metropolitan Transportation Commission is ordered to implement the Transportation Contingency Plan, to wit:

(a) MTC shall adopt sufficient Transportation Control Measures within six months of September 19, 1989 to bring the region back within the "Reasonable Further Progress" line.

(b) MTC shall conclude any hearings with respect to the criteria for delaying projects within 45 days of September 19, 1989. Within 150 days of September 19, 1989, MTC shall, after public hearing, ap-

---

**28.** The above timetables for categories (b)—(d) originally announced on September 19, 1989, were subsequently modified by this Court's orders of January 10, 1990 (consumer solvents), January 17, 1990 (pesticides), and February 5, 1990 (reciprocating engines).

**29.** The Court subsequently imposed implementation dates after the parties were unable to reach agreement. *See* Orders cited in note 28 *supra.*

**1462**

ply that criteria to projects in the Transportation Improvement Program and make a determination as to whether any projects should be delayed due to their significant adverse impact on air quality.

3. Defendants affected by this order shall file and serve reports every 90 days addressing the status of their compliance with this order.

The Court retains jurisdiction over this case for all further matters.

IT IS SO ORDERED.