BAYVIEW HUNTERS POINT
COMMUNITY ADVOCATES,
et al., Plaintiffs,

v.

METROPOLITAN TRANSPORTATION
COMMISSION, et al., Defendants.

No. C01–0750 TEH.

United States District Court,
N.D. California.

July 19, 2002.

Deborah S. Reames, Anne C. Harper, Bruce Edward Nilles, Oakland, CA, Alan Ramo, Environmental Law and Justice Clinic, Golden Gate University School of Law, San Francisco, CA, Helen H. Kang, Golden Gate University School of Law, San Francisco, CA, Richard T. Drury, Communities for a Better Communities, Oakland, CA, Marc Chytilo, Santa Barbara, CA, for plaintiffs.

David D. Cooke, Allen Matkins Leck Gamble & Mallory LLP, San Francisco, CA, Francis F. Chin, Metropolitan Transportation Commission, Joseph P. Bort MetroCenter, Oakland, CA, Donald P. Margolis, City Attorney's Office, City and County of San Francisco, San Francisco, CA, for defendants.

## ORDER GRANTING INJUNCTIVE RELIEF

THELTON E. HENDERSON, District Judge.

These matters came before the Court on Monday, June 10, 2002, on Plaintiffs' Motion for Permanent Injunction and Declaratory Relief Re: Civil Penalties. After careful consideration of the parties' written and oral arguments, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion as discussed below.

## PROCEDURAL BACKGROUND [1]

On November 9, 2001, this Court found Defendants Metropolitan Transportation Commission ("MTC") and San Francisco Municipal Railway ("MUNI") liable for failing to implement Transportation Control Measure 2 ("TCM 2"), a provision that has been a part of California's state implementation plan ("SIP") since 1982. *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 177 F.Supp.2d 1011, 1029–32 (N.D.Cal.2001) [hereinafter "*Bayview*"]. In particular, the Court found both Defendants liable for failing to

---

1. The factual background of this case can be found in the Court's order on liability. *Bayview Hunters Point Cmty. Advocates v. Metro.* *Transp. Comm'n*, 177 F.Supp.2d 1011, 1016–1018 (N.D.Cal.2001).

achieve a 15% increase in regional transit ridership over 1982–83 levels. *Id.* at 1031–32. The Court also found MTC liable for failing to consult with the regional transit operators under step two of TCM 2's implementation schedule. *Id.* at 1030–31. However, the Court noted that such liability was inconsequential because MTC had adopted a target ridership increase, thus fulfilling the purpose of the required consultations. *Id.* On the other three steps of TCM 2's implementation schedule, the Court ruled in Defendants' favor.[2] *Id.* at 1029–31.

When the Court made its liability findings, it believed that the parties would benefit from further settlement discussions regarding an appropriate remedy. *Id.* at 1032–33. Accordingly, the Court referred the parties to a magistrate judge for a mandatory settlement conference. *Id.* The parties were unfortunately not able to reach an agreement during their initial conference with Magistrate Judge Wayne D. Brazil, who was randomly assigned to handle this case. However, Plaintiffs and Defendant MUNI continued their discussions and subsequently reached an agreement. Plaintiffs lodged a copy of this agreement with the Court on May 20, 2002. Pursuant to the parties' request, the United States Department of Justice and the Environmental Protection Agency were given 45 days in which to review and comment on the proposed agreement. This 45–day period expired on July 5, 2002, with no comments submitted by the government.[3] On July 10, 2002, Plaintiffs submitted a request that this Court enter their settlement agreement with MUNI as a consent decree. Good cause appearing, the Court signed Plaintiffs' proposed order, entering the consent decree and dismissing all claims against MUNI with prejudice, on July 11, 2002.

■ As a result, this Court must now only decide the appropriate remedy for the liability of MTC, the sole remaining Defendant. At oral argument, the Court further limited the issues to be resolved in this order through an oral ruling from the bench. Because Plaintiffs continue to reserve their right to request penalties in this case, the Court determined that their request for declaratory relief on civil penalties was premature. Accordingly, the Court DENIED IN PART Plaintiffs' motion, without prejudice, to the extent that it seeks such relief. Thus, the only issues remaining on the instant motion are whether injunctive relief is appropriate and, if so, what such relief should encompass.

## DISCUSSION

### I. *Appropriateness of Injunctive Relief*

■ Because this Court "lacks any power to engage in SIP modification or

---

2. Step one required the six major transit operators to adopt five-year plans for 1983–87 by July 1982. Step three required MTC to seek to ensure that these plans were implemented through the allocation of regional funds and the implementation of the Transportation Improvements Plan ("TIP"). Step four required MTC to monitor ridership gains through annual reports. *Bayview*, 177 F.Supp.2d at 1028 (summarizing TCM 2's requirements).

3. MTC filed a statement on July 3, 2002, agreeing to the settlement but asserting that its terms were inconsistent with Plaintiffs' request for an injunction requiring MTC to achieve a 15% ridership increase, without any exception for "significant public opposition." July 3, 2002 MTC Statement at 2–3. However, this Court has already made clear that MTC bears different, and greater, responsibilities than the regional transit operators in implementing TCM 2. *Bayview*, 177 F.Supp.2d at 1028–29. In addition, as Plaintiffs correctly observe, "the very nature of settlement versus litigation invites the inclusion of ... compromise positions," such as the "significant public opposition" exception. Pls.' Req. for Entry of Order at 1 n.1.

revision," *Bayview*, 177 F.Supp.2d at 1028, the Court concludes that the only appropriate remedy in this case is injunctive relief that requires MTC to comply with TCM 2. As this Court explained in its liability order, a defendant who violates a SIP provision has only two alternatives: It must either comply with the provision or petition the Environmental Protection Agency ("EPA") to remove the provision from the SIP. *Id.* In this case, MTC requested that the EPA remove TCM 2 from the SIP, but the EPA denied this request. *Id.* at 1022. Therefore, unless the EPA grants a subsequent request for removal of the provision, MTC's only option is compliance. *Id.* at 1021–22, 1028. Moreover, as the Second Circuit explained,

> Once a citizen suit to enforce an EPA-approved state implementation plan has been properly commenced, the district court is *obligated*, upon a showing that the state has violated the plan, to issue appropriate orders for its enforcement . . .
>
> . . . .
>
> . . . Congress'[s] intention that the courts must accept [this] duty is clear and unmistakable.

*Friends of the Earth v. Carey*, 535 F.2d 165, 173 (2d Cir.1976) (emphasis added).

All courts that have considered the issue, including this Court, have done just that: accepted the duty imposed upon them by Congress and ordered compliance with the violated SIP provisions.[4] For example, a New York district court found the state liable for failing to meet the implementation schedule set forth in its SIP. *Natural Res. Def. Council, Inc. v. New York State Dep't of Envtl. Conservation*, 668 F.Supp. 848, 852 (S.D.N.Y.1987). As a remedy, the court entered a scheduling order for implementation of each of the violated provisions. *Id.* at 852–58. Similarly, this Court previously issued injunctive relief after finding MTC, the California State Air Resources Board, and the Bay Area Air Quality Management District liable for failing to comply with various SIP provisions. *Citizens for a Better Env't v. Deukmejian*, 731 F.Supp. 1448, 1458–62 (N.D.Cal.1990) [hereinafter "*CBE I*"] (SIP provisions to implement a transportation contingency plan and to adopt and implement control measures to achieve target emissions reductions for four stationary sources); *Citizens for a Better Env't v. Deukmejian*, 746 F.Supp. 976, 981–85 (N.D.Cal.1990) [hereinafter "*CBE II*"] (SIP provisions to adopt contingency measures to make reasonable further progress in reducing hydrocarbon emissions by stationary sources). In addition, another California district court held that "[i]ssuance of [an] injunction is *mandatory* once liability [for failing to comply with a SIP] is established." *Coalition for Clean Air, Inc. v. S. Coast Air Quality Mgmt. Dist.*, No. CV97–6916–HLH (SHx), 1999 U.S. Dist. LEXIS 16106, at *8 (C.D.Cal. Aug. 27, 1999) (emphasis added). Accordingly, upon a finding of liability for failure to implement thirty-one control measures in the California SIP, the court issued an injunction requiring adoption and implementation of those measures by specified dates. *Id.* at *15–16. Finally, a New Jersey district court also issued a scheduling order requiring implementation of SIP provisions that the state was found to have violated. *Am. Lung Ass'n v. Kean*, Civ. A. No. 87–288, 1987 WL 31764, at *7–10 (D.N.J. Nov.19, 1987), *aff'd*, 871 F.2d 319 (3d Cir.1989). The court explained that it was compelled to issue such an order by the Clean Air Act:

---

4. Neither Plaintiffs nor MTC could cite the Court to any case where a court found a defendant liable for violating a SIP but did not order remedial injunctive relief. The Court's own research similarly uncovered no such authority.

I wish to emphasize my view that *the result reached today is in no way the product of judicial discretion, but instead is in every detail compelled by the statutory law of the United States.* In the Clean Air Act, Congress expressed an unmistakeable [sic] desire to attain acceptable levels of ozone pollution "as expeditiously as practicable." In compliance with the Act, New Jersey authored its own plan to control ozone pollution. In accordance with the Act, the EPA reviewed, tightened, and approved the plan. As permitted by the Act, private citizens brought this lawsuit to force New Jersey to follow the plan. In strict conformance with the Act, I have found in favor of those private citizens, and shall enter an order which requires New Jersey, simply, to implement its plan as expeditiously as practicable. The will of Congress, as embodied in the Act, demands nothing more. But it certainly insists on nothing less.

*Id.* at *7 (emphasis added). This Court agrees with this reading of the Act and therefore holds, as it did in the CBE litigation over a decade ago, that the Court's finding of liability compels it to issue an order requiring compliance.

 MTC acknowledges that no court has ever refused to issue such relief upon finding that a defendant has failed to implement a SIP provision. However, at oral argument, it attempted to distinguish the cases described above on two grounds, neither of which persuades the Court. First, MTC argued that the SIP violation in this case is relatively minor when compared with the SIP violations in the cited cases. However, even if this contention were correct, it would not alter the fact that this Court is obligated to enforce the provisions of a SIP. *E.g., Friends of the Earth,* 535 F.2d at 173. State agencies, including MTC, have an "unwavering obligation" to implement SIP provisions, *CBE I,* 731 F.Supp. at 1458, and that obligation

does not waver simply because an agency later decides to characterize a particular provision as "minor." The Court has no authority to declare that certain SIP provisions are "major" enough to demand strict compliance, while others are "minor" enough to be subject to relaxed standards of enforcement; there is simply one standard of enforcement—namely, strict compliance—for all provisions of a SIP. *See, e.g., Friends of the Earth,* 535 F.2d at 178; *Bayview,* 177 F.Supp.2d at 1029. *See also California ex rel. State Air Res. Bd. v. Dep't of the Navy,* 431 F.Supp. 1271, 1294 (N.D.Cal.1977), *aff'd,* 624 F.2d 885 (9th Cir.1980) (holding that the Clean Air Act contains "no exemption for 'insignificant' violations"). As a New Jersey district court judge concluded in a case similar to this one:

> Were I to order the implementation of some parts of the SIP at full speed and other parts at a slower speed, I would not only violate the overriding Congressional direction that ozone-pollution control proceed 'as expeditiously as possible,' I would also rearrange the distribution of compliance costs and benefits which was set by the original terms of the SIP. Under the Act, neither result is tolerable.

*Am. Lung Ass'n,* 1987 WL 31764, at *4. To hold otherwise would effectively require this Court to modify the SIP, thus exceeding the Court's authority. *See, e.g., Citizens for a Better Env't v. Wilson,* 775 F.Supp. 1291, 1298 (N.D.Cal.1991) [hereinafter "*CBE III*"] (holding that "SIP modification and revision can not [sic] be judicially effected").

MTC's second proffered distinction between this case and all similar previous cases fails for the same reason. MTC suggests that this case is unique because some conditions for compliance—i.e., for increasing regional transit ridership by 15% over 1982–83 levels—lie outside of

MTC's control. However, the Court already rejected this argument when it found that TCM 2 required actual achievement of the 15% target increase:

> The Court is sympathetic to Defendants' arguments that outside forces—for example, changing work patterns or individual preferences in choosing to ride or not to ride public transit—might prevent the region from achieving a 15% or, indeed, any other increase in transit ridership. However, this argument is irrelevant to the present inquiry. As this Court has previously held, "States have an unwavering obligation to carry out federally mandated SIPs; thus, where a SIP is violated, liability attaches, regardless of the reasons for the violation." *CBE I*, 731 F.Supp. at 1458. Defendants could have taken the potential effect of individual preferences into account when setting the ridership increase target to be achieved. Now that the target increase has been set, Defendants' only alternative, besides compliance, is to petition the EPA for removal of TCM 2 from the SIP; this Court lacks any power to engage in SIP modification or revision. *CBE III*, 775 F.Supp. at 1296–98.

*Bayview*, 177 F.Supp.2d at 1027–28. *See also Coalition for Clean Air*, 1999 U.S. Dist. LEXIS 16106, at *10 ("The District Court has no jurisdiction to consider issues of feasibility, general practicality, political objections or cost factors in ordering the implementation of a SIP.").

■ Beyond that, MTC's assertion that it could unfairly face a finding of contempt for failing to achieve the 15% ridership increase is both incorrect and premature. As MTC itself notes, impossibility is a defense to contempt charges. *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983). Thus, if MTC fails to achieve the required 15% increase in transit ridership, it will be free to argue during contempt proceedings that achieving the increase was impossible. At this time, the Court does not find it to be impossible for MTC to achieve the increase, even though not all factors affecting transit ridership lie within MTC's control.

MTC further contends that Supreme Court precedent dictates against injunctive relief in this case, but this argument is not persuasive. The holdings in the two cases relied on by MTC—*Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) and *Amoco Production Company v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)—are not as broad as MTC suggests. In both cases, the Supreme Court held that the statutory schemes at issue did not require a district court to issue injunctive relief. *Romero–Barcelo*, 456 U.S. at 320, 102 S.Ct. 1798 (Federal Water Pollution Control Act); *Amoco*, 480 U.S. at 544–46, 107 S.Ct. 1396 (Alaska National Interest Lands Conservation Act). However, this does not equate to holding that the statutory schemes required denial of injunctive relief; instead, the Supreme Court held only that injunctive relief is discretionary rather than mandatory under the statutes at issue. *Romero–Barcelo*, 456 U.S. at 320, 102 S.Ct. 1798 (holding that the FWPCA "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act" and that such relief "can include, but is not limited to, an order of immediate cessation"); *Amoco*, 480 U.S. at 541–46, 107 S.Ct. 1396 (relying on *Romero–Barcelo*).

In addition, neither case concerned the Clean Air Act, the statute at issue here. Notably, none of the Clean Air Act cases discussed above considered any remedy but injunctive relief. Nor did any of the cases refer to the elements of the general test for such relief (i.e., irreparable harm, inadequate legal remedies, and balancing

of harms), *Amoco*, 480 U.S. at 542, 107 S.Ct. 1396, let alone perform the analysis that MTC suggests is required. This further supports the Court's conclusion that injunctive relief is the only appropriate remedy in this case. *See supra* at 1159–62; *see also United States v. City of Painesville*, 644 F.2d 1186, 1194 (6th Cir. 1981) (holding that the Clean Air Act required the district court to issue injunctive relief upon finding that the city violated EPA-promulgated standards, thus making it unnecessary to determine the presence of irreparable injury or the inadequacy of legal remedies).

■ Alternatively, even if the Court did not feel compelled by the Clean Air Act to issue injunctive relief, it would nonetheless exercise its discretion by ordering such relief. In *Amoco*, the Supreme Court explained that "the bases for injunctive relief are irreparable injury and inadequacy of legal remedies. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco*, 480 U.S. at 542, 107 S.Ct. 1396. Here, this test weighs in favor of Plaintiffs. First, in determining that Plaintiffs have standing, this Court held that Plaintiffs have suffered injuries that are fairly traceable to MTC's failure to implement TCM 2, and that the injunctive relief sought by Plaintiffs would redress Plaintiffs' injuries. *Bayview*, 177 F.Supp.2d at 1019–20; *see also Natural*

*Res. Def. Council, Inc. v. United States Envtl. Prot. Agency*, 507 F.2d 905, 910 (9th Cir.1974) (injury suffered where plaintiffs are "compelled to breathe air less pure than that mandated by the Clean Air Act"). Therefore, the Court has already rejected MTC's arguments that TCM 2 is not linked to public health and that "public health is simply not a factor in this case." Opp'n at 16. The Court has also already found, and MTC has never disputed, that implementation of TCM 2 would have some impact on reducing ozone and would further reduce haze and smog. *Bayview*, 177 F.Supp.2d at 1019. Thus, the undisputed evidence demonstrates that failure to implement TCM 2 has caused harm to Plaintiffs and to the environment.

■ Moreover, such harm is irreparable.[5] As the Supreme Court has held, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545, 107 S.Ct. 1396. Unlike *Amoco*, where environmental harm "was not at all probable" and the Supreme Court therefore did not require injunctive relief, *id.*, this case involves certain environmental harm, thereby satisfying the requirements of irreparable harm and inadequate legal remedies.[6] *See Coalition for Clean Air*, 1999

---

**5.** Because the harm is irreparable, it is not, as MTC contends, "merely trifling." Opp'n at 16 (arguing against an injunction in this case because an injunction does not issue "to restrain an act the injurious consequences of which are merely trifling" (quoting *Romero–Barcelo*, 456 U.S. at 311–12, 102 S.Ct. 1798 (quoting *Consol. Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302, 20 S.Ct. 628, 44 L.Ed. 777 (1900))))).

**6.** The presence of actual harm also distinguishes this case from *Rondeau v. Mosinee Paper Corporation*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). In *Rondeau*, the Supreme Court denied injunctive relief in part because "none of the evils to which the Williams Act was directed has occurred or is threatened in this case." *Id.* at 59, 95 S.Ct. 2069. Here, the environmental injuries negatively impact air quality, the protection of which is one of the purposes of the Clean Air Act.

U.S. Dist. LEXIS 16106, at *9 (holding that irreparable injury need not be shown to issue injunctive relief to cure violations of a SIP, but alternatively holding that, if irreparable injury needs to be shown, such a requirement is satisfied by levels of pollution that violate federal air quality standards); *State Air Res. Bd.*, 431 F.Supp. at 1294 (holding that "pollution which violates standards approved by the EPA pursuant to its authority under the [Clean Air] Act is, by definition, presumptively significant and irreparably harmful to health and welfare") (further noting that there are no insignificant Clean Air Act violations because "[i]t is the cumulative effect of innumerable 'insignificant' pollutions which has hung an environmental cloud over our planet").

Next, despite the arguments of MTC and the amici curiae,[7] the balancing of harms weighs in Plaintiffs' favor. Both MTC and the amici assert that reopening the Regional Transportation Plan ("RTP") and Transportation Improvement Program ("TIP") as Plaintiffs propose would be unduly burdensome. MTC and the amici further contend that reopening the RTP and TIP ("the plans") would be against the public interest because it would divert funding from already approved transit projects. However, these arguments contradict MTC's representation that the plans already contain projects sufficient to bring forecasted annual ridership up to 575 million transit boardings in the 2006–07 fiscal year.[8] Brittle Decl. at ¶ 6. MTC cannot argue, on the one hand, that the plans already contain sufficient transit improvement projects to satisfy TCM 2 while arguing, on the other hand, that amending the plans to insert a clear statement of how TCM 2 will be achieved would be overly burdensome. If, as MTC asserts in its papers and emphasized at oral argument, it is confident in its forecasting, then amending the plans to add the statement Plaintiffs seek will not be burdensome at all. The plans will already contain the projects that MTC is relying on to achieve a transit ridership increase, and so all that MTC must do is consolidate information about these projects in a single place. Plaintiffs' proposed amendment certainly will not require, as both MTC and the amici apparently fear, the reopening of funding negotiations and the potential cancellation or delay of projects that were adopted in the RTP. Thus, the harms asserted by MTC and the amici simply will not materialize, given MTC's representation of and confidence in its ridership forecasts.

If, on the other hand, MTC has misrepresented itself to the Court, and the projects in the current RTP are insufficient to meet the required ridership increase, then reopening the RTP and TIP would be even more necessary to achieve compliance with TCM 2. Although some of the feared harms would therefore materialize, any economic hardship suffered by MTC or the amici would not shift the balance of harms in their favor. *See, e.g., Friends of the Earth*, 535 F.2d at 179 ("We are aware that the enforcement of the air quality plan might well cause inconvenience and expense to both governmental and private parties, particularly when a congested

---

7. The amici curiae are the Alameda County Congestion Management Agency, the Contra Costa Transportation Authority, the Marin Congestion Management Agency, the Napa County Transportation Planning Agency, the Santa Clara Valley Transportation Agency, the Solano Transportation Authority, and the Sonoma County Transportation Agency.

8. This figure represents an adjustment to an earlier forecast that takes into account the downturn in the economy and the September 11, 2001 terrorist attacks. Brittle Decl. at ¶¶ 2, 6.

metropolitan community provides the focal point of the controversy. But Congress decreed that whatever time and money otherwise might be saved should not be gained at the expense of the lungs and health of the community's citizens." (footnote omitted)); *Coalition for Clean Air,* 1999 U.S. Dist. LEXIS 16106, at *10 (holding that a district court has no jurisdiction to consider cost issues in ordering the implementation of a SIP). Nor would it lead to the conclusion that injunctive relief requiring amendment of the RTP and TIP would be against the public interest. This Court has already held that the public has "a strong interest in the vigilant enforcement of the Clean Air Act," which includes enforcement of SIP provisions such as TCM 2. *Bayview,* 177 F.Supp.2d at 1024. In addition, even if reopening the RTP would result in delayed or eliminated funding of some transit projects, those projects would be replaced by other transit projects more likely to increase transit ridership. As a result, even though the public interest may be harmed by the loss or delay of certain projects currently in the RTP, any such harm would be outweighed by the benefits of the newly added projects and the enforcement of the Clean Air Act.

 Finally, MTC argues that an injunction is unnecessary in this case because declaratory relief would provide Plaintiffs with a sufficient remedy. However, MTC's position fails to persuade the Court. First, none of the cases relied on by MTC to support this assertion involved the Clean Air Act, which must be the focus of this Court's present inquiry. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (constitutional challenge to local ordinance); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (constitutional chal-

lenge to state criminal statute); *Morrow v. Harwell,* 768 F.2d 619 (5th Cir.1985) (constitutional challenge to prison conditions). Second, MTC's cited authority differs from this case because of the demonstrated need for an injunction here. In *Doran,* the Supreme Court explained that, "a district court can generally protect [the] interests of a federal plaintiff by entering a declaratory judgment." *Doran,* 422 U.S. at 931, 95 S.Ct. 2561. Similarly, the First Circuit in *Morrow* ruled against injunctive relief because "county officials have demonstrated that superintending injunctive relief was not necessary." *Morrow,* 768 F.2d at 628. Here, by contrast, MTC has shown neither that Plaintiffs' interests would be served by a declaratory judgment nor that injunctive relief is not necessary. Despite MTC's asserted record of funding transit projects and seeking to improve public transit in the Bay Area, Opp'n at 2–7, the Court remains unconvinced that MTC is specifically committed to implementing TCM 2.[9] For instance, even after this Court specifically ruled that MTC must implement TCM 2 and that TCM 2 requires achievement of a 15% regional transit ridership increase, MTC has continued to argue that it cannot be required to achieve that increase. In addition, MTC also continues to assert, despite this Court's holding to the contrary, that TCM 2 has been "fully implemented to the extent possible, but by its own terms is out of date." Transportation Air Quality Conformity Analysis for 2001 Regional Transportation Plan and 2001 Transportation Improvement Program Amendment 01–32 at 12 (revised Dec. 14, 2001) (Ex. A to Brittle Decl.) [hereinafter "2001 Conformity Analysis"]. Given MTC's continued denials, and also given that the implementation of TCM 2 is now almost fifteen years

---

9. Because this case is limited in scope to TCM 2, the Court need not decide whether MTC has, as it asserts, truly "place[d] transit at the forefront of its plans and programs for the Bay Area's transportation system." Opp'n at 2.

overdue, the Court rejects MTC's suggestion that declaratory relief would be sufficient in this case. Not only does the Clean Air Act demand more, *see supra* at 1159–62 (discussing the district court's obligation to enforce compliance under the Act), but, "as we have responded to this similar refrain before, [MTC's] past history, and the Court's experience with this litigation, convinces us that continuing judicial oversight at the remedial stage is necessary to ensure timely compliance." *CBE II,* 746 F.Supp. at 982; *see also CBE I,* 731 F.Supp. at 1461.

## II. *Scope of Injunctive Relief*

Having determined that injunctive relief is appropriate, the Court now turns to fashioning the contours of such relief. As should already be evident from the Court's discussion above, the Court intends to order MTC to comply with TCM 2—i.e., to achieve a 15% regional transit ridership increase over 1982–83 levels. The remaining disputes involve the baseline figure for 1982–83 ridership, the time frame within which to require the increase, and the steps MTC must take to achieve the increase. The Court addresses each of these in turn.

### A. *Baseline Figure for 1982–83 Ridership*

 First, the parties disagree over the baseline figure to be used in determining the required 15% ridership increase. Primarily, the parties dispute the figure that the Court should use for MUNI's 1982–83 ridership level.

As reported in Muni's 1986 and 1987 Short Range Transit Plans, methodology errors in determining Muni's annual ridership resulted in FY 82/83 numbers that were most likely too high. Muni has advised that its actual ridership for FY 82/83 is more likely to have been approximately 264 million annual riders

(compared to about 293 million riders that has been assumed for that year[) ]. 2001 Conformity Analysis at 12. Not surprisingly, Plaintiffs urge this Court to adopt the higher figure (293 million) as part of the baseline, while MTC argues in favor of the lower figure (264 million).

The parties offer various arguments in support of their respective positions, but the Court need not resolve any of these arguments because Plaintiffs have already "acknowledge[d] that MUNI's best estimate of its actual ridership for FY 1982–83 was 264 million boardings, and that this figure will be used as the baseline figure for 1982–83." MUNI Settlement at 9. Although Plaintiffs' acknowledgment was only "[f]or purposes of this Settlement Agreement [with MUNI]," *id.,* Plaintiffs elsewhere agreed to be bound by the provisions of the agreement, *id.* at 2. Plaintiffs assert that the baseline is irrelevant for purposes of the settlement agreement because the agreement does not require any specific percentage increase in ridership by MUNI; therefore, Plaintiffs contend, the baseline is also irrelevant to the appropriate remedy for MTC's liability. However, the fact remains that the 264 million baseline figure is in the settlement agreement. If Plaintiffs did not want to be bound by this baseline, then they should not have included it in the settlement—especially given that they contend it is irrelevant. Now that the Court has entered the settlement agreement as a consent decree, the 264 million baseline is part of a court order, and it would be inconsistent for the Court to fashion injunctive relief based on a different baseline figure. In addition, the Court agrees with MTC that it would be nonsensical to apply different ridership baselines to MTC and MUNI. Accordingly, the Court hereby adopts 264 million as the baseline 1982–83 figure for MUNI's ridership.

With respect to the remainder of the baseline, there remains a minor dispute over the correct figure. Plaintiffs contend that, given a MUNI ridership of 264 million, the total 1982–83 ridership baseline should be 474.1 million. Tobey Decl. at Table 4. MTC, on the other hand, contends that the baseline should be 473.7 million, Brittle Decl. at ¶ 11, but offers no explanation for the 0.4 million discrepancy between its figure and Plaintiffs'. Plaintiffs similarly offer no solid evidence explaining the discrepancy, but they assert that their "best guess" is that MTC's numbers may not include paratransit riders.[10] Tobey Decl. at ¶ 15.

Such speculation is insufficient for this Court to reach a conclusion, without further evidence from the parties, on the most accurate 1982–83 baseline ridership figure. However, at less than 0.1 percent, the difference between the parties' figures is extremely slight. In addition, Plaintiffs' only concern is that MTC uses the same basis for calculating future annual ridership figures as it did in calculating the 1982–83 baseline figure. Mot. at 19 n.20 (noting that the difference between Plaintiffs' and MTC's figures is "not significant," but observing that "apples should be compared to apples in calculating the required increase, with paratransit ridership either excluded from or included in both sets of numbers").

Given these circumstances, and because it is MTC that will ultimately bear responsibility for measuring ridership, the Court hereby adopts MTC's figure of 473.7 million as the baseline 1982–83 ridership figure for the region. A 15% increase over this baseline is 544.8 million annual boardings. To alleviate Plaintiffs' concerns, which the Court also shares, the Court directs that, when measuring ridership for purposes of compliance with this order, MTC may only include the types of ridership it included in determining 1982–83 ridership to be 473.7 million. In particular, if MTC did not include paratransit riders in calculating 1982–83 ridership, it may not include such riders in calculating any future ridership data to be reported to this Court.

## B. *Time Frame*

 Next, the parties generally agree that a five-year time frame for achievement of the increase would be appropriate, but there is some disagreement over the specific deadline. Plaintiffs propose November 9, 2006, which would be five years after the date on which the Court found MTC liable for failing to implement TCM 2.[11] MTC objects to any deadline for requiring achievement of the increase, but it asserts that, given present forecasts, the increase should be achieved by no later than the 2006–07 fiscal year—i.e., by June 30, 2007. Opp'n at 8 (citing Brittle Decl. at ¶¶ 2, 6).

The Court finds Plaintiffs' requested five-year time frame to be more than reasonable and therefore adopts November 9, 2006 as the deadline for implementation of TCM 2. TCM 2 originally provided for implementation within five years, and allowing the same amount of time to cure the provision's violation is certainly reasonable. First, courts have

---

10. Plaintiffs offer only one example—SamTrans—where the number of paratransit riders for 1982–83 is approximately equal to the discrepancy between Plaintiffs' and MTC's ridership figures. Tobey Decl. at ¶ 15. However, Plaintiffs offer no similar data for any of the other transit operators. Beyond that, Plaintiffs "have not had the opportunity to thoroughly review the spreadsheets of 1983 data made available to [them] by MTC" and admittedly do not know whether MTC's data includes paratransit riders. *Id.*

11. In their reply, Plaintiffs alternatively propose June 30, 2006, if the Court would prefer to set the deadline at the end of a fiscal year.

routinely ordered compliance with violated SIP provisions in less time than that originally provided by the SIP. *E.g.*, *CBE I*, 731 F.Supp. at 1461; *Am. Lung Ass'n*, 1987 WL 31764, at *3. Beyond that, regional ridership has already increased significantly from the 1982–83 baseline of 473.7 million. For the 2000–01 fiscal year, for example, ridership was reported to be 533 million.[12] Brittle Decl. at ¶ 11. As a result, MTC no longer needs to increase its ridership by a full 15% from today's levels in order to comply with TCM 2. Thus, if anything, MTC should need even less time than the original five-year deadline to achieve TCM 2's full implementation. In addition, MTC asserts that current RTP projects should achieve a ridership of 575 million by June 30, 2007. It is therefore reasonable to require MTC to achieve a ridership of 544.8 million by November 9, 2006. The 575 million estimate for 2006–07 would be an increase of 42 million over six years (based on the reported 533 million figure for 2000–01). Surely MTC does not expect 30 million of that 42 million increase to come in the eight months between November 9, 2006 and June 30, 2007. For all of these reasons, the Court concludes that November 9, 2006, as Plaintiffs originally requested, is a reasonable—and, indeed, generous—deadline for MTC to achieve full compliance with TCM 2.

The Court bases the deadline on the date of its liability order because it agrees with Plaintiffs that MTC should not benefit from waiting for this remedial order before taking steps specifically designed to implement TCM 2. If MTC's contention that it can only compile ridership data at the end of a fiscal year is accurate, then the November 9, 2006 deadline effectively translates into a June 30, 2006 deadline. However, the Court leaves MTC the option of choosing to compile monthly ridership statistics if it would like an additional four months in which to achieve compliance with TCM 2.

## C. *Steps Required to Achieve the Specified Ridership Increase*

■ Plaintiffs urge this Court to impose intermediate deadlines on MTC in addition to the final five-year deadline for achieving full compliance. In particular, Plaintiffs request that the Court require MTC to repeat steps two through four of TCM 2's implementation schedule—namely, that MTC consult with regional transit operators; that MTC amend the RTP and TIP to specify how it will achieve the target ridership increase through its funding allocations; and that MTC track regional ridership levels on an annual basis to monitor progress towards achievement of the target increase. While the Court agrees that some interim deadlines are appropriate to ensure full implementation of TCM 2 by the specified deadline, it will not require TCM 2's complete re-implementation because MTC has not been found liable for failing to implement all aspects of the provision.[13] To the contrary, the Court only found MTC liable for failing to achieve the 15% target ridership

---

**12.** Plaintiffs suggest that 2001–02 ridership will decrease based on ridership figures available for July–December 2001. However, Plaintiffs estimate that 2001–02 ridership will be 522.4 million—still well over the 1982–83 baseline ridership of 473.7 million. Tobey Reply Decl. at Table 2.

**13.** Nor, as MTC observes, do Plaintiffs actually request that TCM 2 be completely re-implemented, even though that would be a logical extension of their argument. To re-implement TCM 2 completely would require MTC to consult with regional transit operators to set a target ridership increase to be achieved within a five-year period. Plaintiffs never request that this be done and instead continue to insist—correctly—that TCM 2 requires that a 15% increase in regional transit ridership be achieved over 1982–83 levels.

increase required by TCM 2.[14] *Bayview,* 177 F.Supp.2d at 1029–32. As a result, it would be overbroad for this Court to require MTC to repeat the three TCM 2 implementation steps cited by Plaintiffs solely because they were included in the original TCM 2.

However, the Court is not barred from requiring MTC to comply with some of these steps if, in exercising its equitable powers, the Court finds such steps to be necessary to achieve the target ridership increase. *See, e.g., Stone v. City & County of San Francisco,* 968 F.2d 850, 861 (9th Cir.1992) (noting that a district court "has broad equitable remedial powers").[15] Given the record in this case, the Court finds it necessary to require MTC to both (1) amend the RTP to include a section addressing specifically how MTC will achieve the target increase and (2) provide the Court with regular reports describing its efforts towards achieving compliance, including interim ridership statistics.

First, the RTP "represents the transportation policy and action statement of the MTC for addressing the region's transportation needs over the next 25 years." 2001 Conformity Analysis at 1. As such, it is important for the RTP to include a statement on how MTC intends to implement TCM 2. This is especially so given that MTC still contends that TCM 2 has been "fully implemented to the extent possible, but by its own terms is out of date." *Id.* at 12.[16] Because MTC contends that the RTP already contains sufficient projects to achieve the target increase, it should not, as noted earlier in this order, be burdensome for MTC to prepare the required RTP amendment. Thus, the Court orders MTC to amend the RTP within six months of the date of this order. Such amendment must include descriptions of the specific projects that MTC will fund in order to achieve the required ridership increase by November 9, 2006; each project description shall include an implementation schedule, along with estimated costs and expected ridership gains.[17]

14. The Court also technically found MTC liable for failing to consult with the regional transit operators, but it noted that such liability was inconsequential because the purpose of those consultations—setting the ridership target to be achieved—was fulfilled. *Bayview,* 177 F.Supp.2d at 1031.

15. MTC cites *Hoptowit v. Ray,* 682 F.2d 1237, 1251 (9th Cir.1982), and *Hoptowit v. Spellman,* 753 F.2d 779, 785 (9th Cir.1985), to support the proposition "that a court cannot require a defendant to take any action unless failure to take that action has been found to have been a violation of the law." Opp'n at 14. However, the cited cases are distinguishable from this case, in which the Court issues remedial relief for an identified violation—i.e., the failure to achieve a 15% regional transit ridership increase. MTC cites no authority that precludes this Court from ordering intermediate steps as part of that remedial relief. Nor does it cite any authority that prevents the Court from including, among those intermediate steps, repetition of actions that MTC may have already taken in the past.

16. MTC at least acknowledges that, "[a] recent court order has found that there is a continuing obligation to obtain a 15% regional transit ridership increase. Further proceedings are still pending in regards to this order." 2001 Conformity Analysis at 12. However, an amendment is still necessary to clarify exactly what these "further proceedings" have determined is required and what steps MTC will take to achieve compliance with those requirements.

17. The Court agrees with Plaintiffs that MTC would be well-advised to set interim ridership milestones to be achieved by 2004 and 2005. However, TCM 2 only requires that a 15% increase be achieved and does not provide any timetable by which that increase must be incrementally achieved. Thus, in theory at least, MTC could comply with TCM 2 by keeping ridership constant for the first four years and boosting ridership to the requisite levels in the fifth year. In other words, intermediate milestones are not required to comply with TCM 2, and the Court therefore does not include them in this remedial order.

To the extent that such projects must be added to the TIP to receive funding, MTC must also amend the TIP within six months of the date of this order.

Second, given that MTC has failed to comply with TCM 2 for nearly fifteen years and continues to deny that TCM 2 requires actual achievement of a ridership increase, this Court finds it prudent to regularly monitor MTC's progress towards full implementation of TCM 2. To this end, MTC shall file quarterly progress reports detailing the actions it has taken towards complying with this order. The first such report shall be due on November 9, 2002. Subsequent reports will be due on February 9, May 9, August 9, and November 9 of each year until November 9, 2006.[18] Each August report shall include updated ridership statistics for the previous fiscal year. Because the Court is not requiring MTC to file a report on August 9, 2002, the November 9, 2002 report shall contain the ridership statistics for the 2001–02 fiscal year.

Finally, Plaintiffs request that this Court enjoin MTC from approving future TIPs or TIP amendments until after the RTP has been amended, with an exception relating to projects that are expected to increase regional transit ridership. As MTC points out, however, TIP amendments are often made for administrative or "housekeeping" purposes that have nothing to do with funding decisions. Heminger Decl. at ¶ 12. In addition, although the Court understands Plaintiffs' concerns that existing projects may need to be stopped or delayed in order to implement TCM 2 by the required deadline, the Court does not find it necessary or appropriate to issue such a wide-reaching injunction at this time. Nor would Plaintiffs' proposed injunction necessarily stop any existing

projects from moving forward: If a project is already in the RTP and TIP, then no amendment would be necessary for MTC to proceed with the project; thus, enjoining TIP amendments would not stop any projects that fall into this category. In any event, it would be overstepping this Court's bounds to issue the injunction Plaintiffs seek at this time, and the Court therefore cannot do so. However, through this order, MTC now has a clear sense of its responsibilities under TCM 2, and it would therefore be ill-advised to amend the TIP in any way that would make compliance unlikely.

## CONCLUSION

In summary, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Permanent Injunction and Declaratory Relief Re: Civil Penalties. First, as already ordered from the bench at the June 10, 2002 hearing, Plaintiffs' request for declaratory relief on civil penalties is DENIED without prejudice as premature. Second, Plaintiffs' request for injunctive relief is GRANTED in accordance with the above discussion. Accordingly, IT IS HEREBY ORDERED that:

1. By no later than **November 9, 2006,** MTC shall increase regional transit ridership to at least 544.8 million annual boardings. This figure reflects a 15% increase over the 1982–83 baseline of 473.7 million annual boardings.

2. MTC shall amend the RTP to include a section specifying how it will achieve full implementation of TCM 2. In this amendment, MTC shall identify and describe all projects it will fund as part of its strategy for achieving the required ridership increase. Each project description must include an implementation schedule,

---

**18.** Of course, MTC may request relief from these reporting obligations if it achieves the required increase prior to November 9, 2006, or if TCM 2 is removed from the SIP prior to that date.

estimated costs, and expected ridership gains. If any of these projects are not already in the TIP, then MTC must further amend the TIP as necessary to allow the projects' funding to proceed. MTC shall file and serve copies of the required amendments no later than **six months from the date of this order**.

3. MTC shall file and serve quarterly reports detailing the progress it has made in complying with this order. These reports are due on **February 9, May 9, August 9, and November 9** of each year until November 9, 2006. The first report is due on **November 9, 2002,** and shall include regional ridership statistics for the 2001–02 fiscal year. Statistics for subsequent fiscal years shall be included in each August report.

4. The parties shall appear on **August 26, 2002, at 1:30 PM,** for a case management conference to discuss how to proceed on the outstanding penalties issue and any other matters remaining to be resolved in this case. After meeting and conferring, the parties shall file a joint case management statement no later than **August 19, 2002**.

Finally, because the Court did not rely on any of the disputed evidence in making the above rulings, Defendant's Evidentiary Objections and Plaintiffs' Motion to Strike Defendant's Evidentiary Objections are hereby DENIED as moot.

**IT IS SO ORDERED**.